STUART, Justice.
This Court granted the petition for the writ of certiorari in this child-visitation case to determine whether the Court of Civil Appeals’ no-opinion affirmance of the trial court’s order awarding the noncustodial father unsupervised visitation conflicts with prior decisions of that court. We find the decision is in conflict with prior decisions, and we reverse and remand.
I.
Emily Richey Thompson (“Thompson”) and Kristopher Eric Richey (“Richey”) met in 2001 and started dating shortly thereafter. In October 2001, Thompson became pregnant with the parties’ child, who was born on July 8, 2002. At the time the child was born, the parties were not married and were no longer dating. They reconciled shortly after the child was born, and they married on May 8, 2004. In September 2005, the parties separated. They reconciled briefly and then separated for the final time in December 2005.
Thompson filed for divorce and sought custody of the minor child and requested that Richey’s visitation with the child be supervised visitation. She requested supervised visitation primarily because she alleged that Richey had sexually abused the child and also based on the facts that Richey had used cocaine, marijuana, crystal methamphetamine, oxycodone, Xanax, and methadone, that he had been in drug and alcohol rehabilitation a number of times and had repeatedly relapsed, and that in 2006 he had been arrested twice for driving under the influence of alcohol and once for public intoxication. The parties appeared at a hearing held in March 2007, at which, upon agreement of the parties, the parties were divorced. All other issues were reserved for the final hearing. In its pendente lite order, the trial court, by agreement of the parties, awarded custody of the minor child to Thompson and ordered that Richey have supervised visitation.
At the final hearing in September 2007, the evidence revealed the following facts relevant to Richey’s visitation with the minor child: Richey was 26 years old at the time of the final hearing. In 2006 he was arrested twice for driving under the influence. In that same year, he was arrested for public intoxication. He admitted to having used cocaine, marijuana, and crystal methamphetamine. When Richey was a juvenile, he was adjudicated delinquent on the underlying charge of driving under the influence of alcohol. He was also adjudicated a youthful offender based on the underlying charge of driving under the influence of alcohol.
Richey has attended three rehabilitation programs. He attended a program called Three Springs as a juvenile. He attended a program offered by Rapha Ministries while he and Thompson were dating. Nonetheless, he again started using Xanax and methadone and drinking alcohol. Then, in September 2006, he attended another rehabilitation program at the Sunrise Lodge in Russellville.
At the March 2007 hearing that took place in this case, Richey claimed to be clean and sober. He testified that he had not used any drugs or alcohol in six months. Within 10 days of that hearing he was seen at a local bar, consuming alcohol. He admitted at the September 2007 hearing that he continues to drink alcohol. According to Thompson, on three or four occasions between March 2007 and September 2007, Richey telephoned Thompson while he was under the influence of either drugs or alcohol.
*267 Much of the testimony in this case focused on Richey’s alleged sexual abuse of the minor child. One incident occurred in July 2004, while the parties were married and living together. Thompson came home from work and found the two-year-old child sitting on Richey’s lap. When the child hopped down, Thompson saw that Richey was sexually aroused. Richey acknowledged that this event occurred and stated that it was “very abnormal.” He admitted that it “concerned” him, but he never sought any counseling in connection with the event.
In January 2006, the child complained to her mother of irritation in her genital area. Thompson observed redness and irritation in the area. Because of the irritation, the child could not sit down in a tub of water. When Thompson asked the child what was wrong, she told Thompson that her father had touched her. The child’s pediatrician diagnosed her as having vulvovaginitis but could not say whether the child had been sexually abused.
Thompson reported the incident to the Marshall County Department of Human Resources (“DHR”). Ann Stephenson, a child-abuse investigator who had worked for DHR for 20 years at the time of the hearing, testified in this case. She stated that she has performed “several hundred” investigations. She testified that upon completing her investigation, she made a finding that the child’s complaint of sexual abuse at the hands of her father was “indicated.” She explained that a finding of “indicated” means “that the Department believed the child.” Stephenson also explained that the sexual-abuse case was due to be presented to the grand jury the next time it was convened. Richey denied inappropriately touching the minor child. He contested the finding of “indicated” and requested a hearing with DHR. After an administrative review of the case at which no witnesses were presented, DHR’s finding was changed to “not indicated.” No evidence as to the reason for the change was presented at the final hearing. Stephenson maintained her opinion that the child’s account of the incident was truthful. Stephenson recommended that Richey’s visitation with the child be supervised.
Sherry Swindall, the clinical director of and a child therapist employed by the Marshall County Child Advocacy Center also testified in the trial of this case. She interviewed the child extensively. She explained that the child “made an outcry of sexually inappropriate touching by her father.” Based on her interviews, Swindall recommended that the child have no unsupervised visits with the father. She remained of that same opinion the date of the final hearing. She explained that she had seen no indication during her interviews with the child that the child had been coached.
Following the hearing, the trial court entered its final judgment finding that there was “no credible evidence presented in this hearing that the Defendant/father committed any act of sexual abuse or misconduct with the minor child” and awarding Richey unsupervised visitation with the minor child. Thompson appealed. The Court of Civil Appeals affirmed the trial court’s order, without an opinion. Thompson v. Richey (No. 2070305, July 18, 2008), 30 So.3d 466 (Ala.Civ.App.2008) (table). Thompson petitioned this Court for a writ of certiorari, which we granted. Thompson filed a brief addressing the merits; Richey did not file a brief.
II.
Thompson asserts that the Court of Civil Appeals’ affirmance of the trial court’s order is in conflict with prior decisions of that court. The trial court found “no credible evidence presented in this *268 hearing that the Defendant/father committed any act of sexual abuse or misconduct with the minor child.” She urges that the Court of Civil Appeals’ affirmance is in conflict with Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala.Civ.App.2007), in which the Court of Civil Appeals stated: “ ‘ “[W]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.” ’ ” (Quoting B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999), quoting in turn Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979).)
Thompson argues that the trial court’s finding that there was no credible evidence of sexual abuse is clearly erroneous based on the testimony of the DHR child-abuse investigator, Stephenson, who investigated the allegations of sexual abuse in this case and found them “indicated,” recommended that Richey’s visitation with the child be supervised, and stated a criminal case against Richey would be presented to the next grand jury to convene in Marshall County. She also cites the testimony of Swindall, the clinical director of and child therapist employed by the Marshall County Child Advocacy Center, who, after conducting numerous interviews with the child, testified that the child made “an outcry of sexually inappropriate touching by her father” and that she saw no indication that the child had been coached and who recommended supervised visitation. Lastly, she points to her own testimony that the minor child told her that her father had touched her.
The facts in Cheek v. Dyess are quite different from those in the present case. Cheek v. Dyess involved a modification of child custody in a case in which the custody of two younger children had been transferred from the mother to the father because the children were not being encouraged to respect their father and other adults and because of lack of supervision of and bad conduct primarily by an older sibling whose custody remained with the mother. The Court of Civil Appeals reversed the trial court’s judgment on the custody issue; this Court granted the writ of certiorari and, after a review of the record, quashed the writ. Although factually different, an identical legal principle applies in Cheek v. Dyess and this case. Even when the ore tenus rule is applicable, when the conclusion of the trial court is so contrary to the weight of the evidence that witness demeanor could not substantiate it, it is clearly erroneous and must be reversed.
The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision will not be reversed unless it has exceeded its discretion. Alexander v. Alexander, 625 So.2d 433, 435 (Ala.Civ.App.1993).
“Every case involving a visitation issue must be decided on its own facts and circumstances, but the primary consideration in establishing the visitation rights accorded a noncustodial parent is always the best interests and welfare of the child.”
Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994).
When a trial court’s judgment in a nonjury case is based on ore tenus testimony, the court’s findings are presumed correct, and its judgment based on those findings will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. BSI Rentals, Inc. v. Wendt, 893 So.2d 1184, 1186 (Ala.Civ.App.2004). “‘However, even under the ore tenus rule, “where the conclusion of the trial court is so opposed to the *269 weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.” ’ ” Cheek v. Dyess, 1 So.3d at 1029 (quoting B.J.N. v. P.D., 742 So.2d at 1274, quoting in turn Jacoby v. Bell, 370 So.2d at 280).
Furthermore, the ore tenus rule, which cloaks a trial court’s judgment in a nonjury case based upon ore tenus evidence with a presumption of correctness, applies only to disputed issues of fact. Thus, although the issue whether Richey touched his daughter sexually, leading to redness and irritation of her genitalia, which was diagnosed as vulvovaginitis, a claim he adamantly denied, would be subject to the ore tenus rule, numerous facts present in this case would not be subject to the ore tenus rule because those facts were undisputed. Those facts not subject to dispute include: Richey attended a “boot camp” as the result of a conviction on an assault charge; he had used and abused cocaine, oxycodone, Xanax, methadone, and alcohol; he had attended three different drug and alcohol rehabilitation programs, completing only the last program and subsequent to completing that program he had recommenced drinking alcohol; in the year before the final hearing he had been arrested twice for driving under the influence of alcohol and once for public intoxication; and at the time of the final hearing he had been convicted of one driving-under-the-influence charge and the public-intoxication charge and the other driving-under-the-influence charge was still pending. Also, it is undisputed that Richey has a violent temper and has thrown items such as drink cans, a cooler, and telephones; he has kicked down doors on two occasions; he pushed Thompson down once and threw her down another time; and, shortly before the final hearing, he flew into a fit of rage in the presence of the minor child. In addition, Richey did not have a valid driver’s license at the time of trial because of his arrests and convictions, but he continued to drive even though he knew it was illegal because he stated “he had to.” He fathered another child who was a year older than the minor child by another woman and was in the process of consenting to the termination of his parental rights to that child. Lastly, Richey did not deny the incident in which Thompson saw that he was aroused when the minor child got off his lap. He acknowledged that the arousal was inappropriate and abnormal, yet he did nothing to seek help following the incident. These facts clearly made an award of unsupervised visitation inappropriate and, in fact, clearly erroneous.
Thompson also alleges that the Court of Civil Appeals’ affirmance in this case is in conflict with I.L. v. L.D.L., 604 So.2d 425 (Ala.Civ.App.1992). In I.L.:
“The mother testified to the following: When the child was one-year-old, the mother suspected an abuse problem because of the way that the child was acting, and she took her to the pediatrician. The pediatrician told the mother not to worry if the child was not ‘ripped and torn.’ After the divorce the mother again noticed inappropriate behavior by the child after the child returned from her weekend visitation with her father. She took the child to the pediatrician, who called in a nurse-specialist from the abuse clinic.
“On the morning after the next weekend visitation, the mother took the child back to the pediatrician. The pediatrician called the Child Advocacy Center (Center) and the Department of Human Resources (DHR). The child was counseled at least twelve times by a certified clinical psychologist at the Center. The *270 mother also went to group counseling so that she would be able to help the child. She filed her motion to suspend visitation in response to what she was told by a health care professional.
“In describing the child’s conduct since the divorce, the mother stated that the child has been very scared of men with beards and that the father used to have a beard. At first the child would stick things near her vagina and place her finger in her mouth and say ‘Daddy do this, Momma. Daddy do it.’ Then the child would touch her vaginal area and say ‘Daddy pee pee, Mommy.’ The child would wake up screaming in the middle of the night and would not let anyone touch her. This behavior has subsided.
“The mother, whose income is $700 per month, testified that her expenses for the child have increased and that she has been told that the child will need counseling for the rest of her life.
“The maternal grandmother testified that prior to the divorce the child had nightmares and that she never wanted to be left alone with her father. She further stated that after the divorce the child would scream, kick, and shut the door in her father’s face, saying ‘no, Daddy, no, no, no.’ She further testified that ‘[w]hen [the child] returned from visitation, she laid in the floor and grabbed herself in the groin and said Daddy, ma. Daddy do, ma. She stuck her finger in her mouth and shoved it back and forth and said daddy, ma, daddy.’
“A social worker in a protective services capacity with DHR testified to the following: DHR does have a concern for the child and recommends that the child’s visitation with the father be supervised. The father did not cooperate with the investigation into his living conditions, as he did not want her to talk to the people with whom he lived. She did not complete the investigation of the father’s home, which was in another county, and then he joined the military. She needs to reinterview the father because of new information in her report to the court that was received from the child psychologist. Although the social worker asked the father’s attorney to have the father contact her as soon as he arrived from his military service, the father did not contact her.
“The report of the psychologist gave the social worker more ‘reason to suspect.’ Some of her conclusions are based on an interview with the child. She was unable to totally assure the court that information obtained from a two-and-one-half-year-old child would be accurate.
“The social worker submitted a report to the trial court that included the following: In an interview the maternal grandfather stated that he had been concerned about the father since the child was eight or nine months old and that he noticed the father taking an excessive amount of time to change the child’s diapers. He stated that he saw the child sit on a metal turtle doorstop and rub herself on it, and he found this action very upsetting. In addition, the psychologist told the social worker that
“ ‘the [child] had told her additional information and made a disclosure of sexual abuse by her “Daddy” to [the psychologist], during several counseling sessions. The sessions began in March. According to [the psychologist], the child picked up the anatomical doll she called “daddy” and said “daddy’s peepee” and put it in her mouth. Each time the child comes to counsel with [the psychologist] she asks for the “Nonnie doll” and “Daddy *271 doll.” When the child stuck the “pee pee” in her mouth, she says “Yuk.” [The psychologist] asked the child, ‘Tour daddy”? and [the child] said ‘Tes.” ’
“The social worker further stated in the report that she planned to talk to the child again but that she had not yet done so. She found her separate interviews with family members and others to be believable.”
604 So.2d at 427-28. The Court of Civil Appeals noted:
“The trial judge stated at the hearing that he did not have much confidence in reports and that ‘this is the sort of thing you ought to have worked out between yourselves.’ He further stated that he has ‘problems with people who draw conclusions about what two and one-half or two-year-old children say or do.’ ”
604 So.2d at 428. The Court of Civil Appeals reversed the trial court’s order granting the father unsupervised visitation. Thompson argues that the present case is in conflict with l.L. because in this case the Court of Civil Appeals affirmed the trial court’s order granting unsupervised visitation and, in essence, its finding that there was no credible evidence of sexual abuse, which Thompson equates to the trial court’s having a “problem” with the opinions of her two experts. We agree. The expert witnesses both recommended supervised visitation by Richey. The trial court disregarded their testimony and their recommendations and awarded Richey unsupervised visitation.
Lastly, Thompson asserts that the Court of Civil Appeals’ no-opinion affirmance conflicts with the holding in Y.A.M. v. M.R.M., 600 So.2d 1035 (Ala.Civ.App.1992). In Y.A.M. v. M.R.M., the mother claimed that the father had sexually abused the parties’ three-year-old daughter. The father’s visitation was to be supervised on a pendente lite basis. At trial, the mother testified that .the child had told her that her father had hurt her. A Department of Human Resources social worker testified that she had an opinion about what had happened to the child but she was not permitted to state it because she had not been qualified as an expert witness. A therapist with the Child Advocacy Center testified about the disclosures the child had made to her and recommended that visitation with her father be supervised. In spite of this testimony, the trial court granted the father unsupervised visitation. The Court of Civil Appeals disagreed. In so doing it stated:
“In view of the evidence presented, we find that granting unsupervised visitation to the father at this time is not in the best interests and welfare of the daughter. Consequently, we hold that the trial court abused its discretion by awarding unsupervised and overnight visitation to the father.... ”
The primary consideration in establishing visitation rights for the noncustodial parent is the best interests and welfare of the child. In l.L. and Y.A.M., the Court of Civil Appeals found supervised visitation by the noncustodial parents to be in the best interests and welfare of the minors in the face of allegations of sexual abuse and recommendations by expert witnesses that visitation be supervised. Those facts are present in this case. Additionally, in the present case, there is substantial undisputed evidence of Richey’s inappropriate sexual arousal when the child, then two years old, sat on his lap, of Richey’s abuse of drugs and alcohol, of his repeated attempts at rehabilitation and subsequent relapses, and of three alcohol-related arrests in a very short period, as well as his admission that he continues to drink alcohol and the fact that he has exhibited rage and inappropriate violent conduct in the presence *272 of the minor child. A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child. The totality of circumstances indicates the trial court’s award of unsupervised visitation here is improper, and in making such an award the trial court exceeded the discretion permitted a trial judge in matters involving child custody and visitation. The judgment of the Court of Civil Appeals is reversed, and the case is remanded with instructions to reverse the trial court’s judgment and remand the cause to the trial court.
REVERSED AND REMANDED.
LYONS, SMITH, BOLIN, MURDOCK, and SHAW, JJ., concur.
COBB, C.J., and WOODALL and PARKER, JJ., concur in the result.